1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission<br><br>Plaintiff,<br><br>v.<br><br>American Business Builders, LLC, et al.,<br><br>Defendants. | No. CV-12-02368-PHX-GMS<br><br>AMENDED STIPULATED FINAL ORDER FOR PERMANENT INJUNCTION AND MONETARY JUDGMENT AGAINST DEFENDANTS AMERICAN BUSINESS BUILDERS, LLC; UMS GROUP, LLC; UNITED MERCHANT SERVICES, LLC; UNLIMITED TRAINING SERVICES, LLC; AND SHANE MICHAEL HANNA |

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), filed its Complaint for Permanent Injunction and Other Equitable Relief on November 6, 2012, subsequently amended on December 14, 2012 ("Complaint"), pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b. The Complaint alleges that Defendants American Business Builders, LLC; ENF, LLC (also doing business as Network Market Solutions); UMS Group, LLC; United Merchant Services, LLC; Universal Marketing and Training, LLC; Unlimited Training Services, LLC; Shane Michael Hanna (also known as Shane Michael Romeo); and Stephen Spratt violated Section 5 of the FTC Act, 15 U.S.C. § 45(a) and the Commission's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities," 16 C.F.R. Part 437, as amended. That same day, the Court entered a Temporary Restraining Order with Asset Freeze, Appointment of a Temporary

Receiver and Other Equitable Relief, and Order to Show Cause why a Preliminary Injunction Should Not Issue and a Permanent Receiver Should Not be Appointed ("TRO").  The Court subsequently extended the TRO by stipulation of the parties.  On August 29, 2013, the Court entered an Order re Preliminary Injunction with Asset Freeze, Appointment of Receiver and Other Equitable Relief with Respect to All Defendants ("Preliminary Injunction").  On December 2, 2013, the Court entered an order modifying the Preliminary Injunction to transfer possession of two jet skis, a jet-ski trailer, and a travel trailer owned by Shane Michael Hanna to the Receiver appointed over the Corporate Defendants for liquidation.

The Commission and Defendants American Business Builders, LLC; UMS Group, LLC; United Merchant Services, LLC; Unlimited Training Services, LLC; and Shane Michael Hanna have stipulated to the entry of this Stipulated Order for Permanent Injunction and Monetary Judgment ("Order") to resolve all matters in dispute in this action between them.

**THEREFORE, IT IS ORDERED** as follows:

**FINDINGS**

1.    This Court has jurisdiction over this matter.

2.    The Complaint charges that Defendants participated in deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and violated the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities," 16 C.F.R. Part 437, as amended, in connection with the advertising, marketing and sale of a business opportunity.

3.    Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order.  Only for purposes of this action, Defendants admit the facts necessary to establish jurisdiction.

4.    Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.  Defendants further

waive and release any claims they may have against the Commission, its employees, representatives, or agents, and the Receiver, its employees, representatives, or agents.

5.      Defendants and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

**DEFINITIONS**

For purposes of this Order, the following definitions shall apply:

A.      "Business opportunity" means a commercial arrangement in which:

1.  A business opportunity seller solicits a prospective purchaser to enter into a new business; and

2.  The prospective purchaser makes a required payment; and

3.  The business opportunity seller, expressly or by implication, orally or in writing, represents that the business opportunity seller or one or more designated persons will:

a.      Provide locations for the use or operation of equipment, displays, vending machines, or similar devices, owned, leased, controlled, or paid for by the purchaser; or

b.      Provide outlets, accounts, or customers, including, but not limited to, Internet outlets, accounts, or customers, for the purchaser's goods or services; or

c.      Buy back any or all of the goods or services that the purchaser makes, produces, fabricates, grows, breeds, modifies, or provides, including but not limited to providing payment for such services as, for example, stuffing envelopes from the purchaser's home.

B.      "Business opportunity seller" means a person who offers for sale or sells a business opportunity.

C.      "Charitable contribution" means any donation or gift of money or any other thing of value.

D.      "Corporate Defendants" means American Business Builders, LLC; UMS

Group, LLC; United Merchant Services, LLC; Unlimited Training Services, LLC; and their successors and assigns.

E.     "Defendants" means Individual Defendant and the Corporate Defendants, individually, collectively, or in any combination.

F.     "Designated person" means any person, other than the business opportunity seller, whose goods or services the business opportunity seller suggests, recommends, or requires that the purchaser use in establishing or operating a new business.

G.     "Do Not Call request" means a statement by a person that he or she does not wish to receive outbound telephone calls by or on behalf of an entity.

H.     "Entity-specific Do Not Call list" means a list of telephone numbers created to comply with Do Not Call requests.

I.     "Established business relationship" means a relationship between the telemarketing seller and a person based on:  (1) the person's purchase, rental, or lease of the telemarketing seller's goods or services or a financial transaction between the person and the telemarketing seller, within the 18 months immediately preceding the date of the telemarketing call; or (2) the person's inquiry or application regarding a product or service offered by the telemarketing seller, within the three months immediately preceding the date of the telemarketing call.

J.     "Individual Defendant" means Shane Michael Hanna also known as Shane Michael Romeo.

K.     "National Do Not Call Registry" means the National Do Not Call Registry, which is the "do-not-call" registry maintained by the Commission pursuant to 16 C.F.R. § 310.4(b)(1)(iii)(B).

L.     "New business" means a business in which the prospective purchaser is not currently engaged, or a new line or type of business.

M.     "Outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.

1    N.    "Person" means a natural person, organization, or other legal entity,

2  including a corporation, partnership, proprietorship, association, cooperative, government

3  or governmental subdivision or agency, or any other group or combination acting as an

4  entity.

5    O.    "Personal Property" means Individual Defendant's two American gold

6  eagle coins and one Pamp Suisse gold bar, identified in Item 17 and Attachment L of the

7  Financial Statement of Individual Defendant dated November 20, 2013.

8    P.    "Phoenix Real Property" means Individual Defendant's condominium

9  situated in Phoenix, Arizona and identified on Item 18 of the Financial Statement of

10  Individual Defendant dated November 20, 2013, together with any other structures,

11  improvements, appurtenances, hereditaments, and other rights appertaining or belonging

12  thereto.

13    Q.    "Provide locations, outlets, accounts, or customers" means furnishing the

14  prospective purchaser with existing or potential locations, outlets, accounts, or customers;

15  requiring, recommending, or suggesting one or more locators or lead generation

16  companies; providing a list of locator or lead generating companies; collecting a fee on

17  behalf of one or more locators or lead generating companies; offering to furnish a list of

18  locations, outlets, accounts or customers; or otherwise assisting the prospective purchaser

19  in obtaining his or her own locations, outlets, accounts, or customers.

20    R.    "Real Property Net Proceeds" means the total proceeds from the sale or

21  auction of the Phoenix Real Property after payment of any reasonable and customary fees

22  and costs, including real estate agent fees, auction fees, and escrow costs, incurred in

23  connection with such sale or auction.

24    S.    "Receiver" means the receiver appointed by the Court pursuant to the

25  Preliminary Injunction over the Corporate Defendants; ENF, LLC (also doing business as

26  Network Market Solutions); and Universal Marketing and Training, LLC.

27    T.    "Recreation Vehicle Net Proceeds" means the proceeds from the sale or

28  liquidation of Individual Defendant's 2011 Coachman trailer, 2000 Bombardier jet ski,

2003 Polaris jet ski, and 2004 Zieman jet ski trailer, identified in Item 16 of the Financial Statement of Individual Defendant dated November 20, 2013 and ordered to be transferred to the Receiver and liquidated on December 2, 2013, after payment of any reasonable and customary fees incurred in connection with such sale or liquidation.

U.     "Required payment" means all consideration that the purchaser must pay to the business opportunity seller or an entity controlled by, controlling, or under common control with a business opportunity seller, either by contract or practical necessity, as a condition of obtaining or commencing operation of the business opportunity.  Such payment may be made directly or indirectly through a third party.

V.     "Spratt Defendants" means Stephen Spratt; ENF, LLC (also doing business as Network Market Solutions); Universal Marketing and Training, LLC; and their successors and assigns.

W.     "Telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.

X.     "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. Telemarketing does not include catalog solicitations defined by 16 C.F.R. § 310.2 (cc) or any other act or practices exempt by 16 C.F.R. § 310.6.

Y.     "Telemarketing Sales Rule" means the FTC Rule entitled "Telemarketing Sales Rule," 16 C.F.R. Part 310, attached hereto as Appendix B.

Z.     "Telemarketing seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration whether or not such person is under the jurisdiction of the Commission.

AA.     "Vehicle Net Proceeds" means the proceeds from the sale or liquidation of any vehicle after payment of (1) any reasonable and customary fees incurred in connection with such sale or liquidation and (2) any remaining loan balance on the

1    vehicle.

2         BB.    "Work-at-home opportunity" means any good, service, plan, program, or

3    opportunity that is represented, expressly or by implication, to assist an individual in any

4    manner to earn money while working from home, whether or not a business opportunity.

5                                    **ORDER**

6                                      **I.**

7                **BAN ON SALE OF BUSINESS OPPORTUNITIES**

8                **AND WORK-AT-HOME OPPORTUNITIES**

9         IT IS ORDERED that Defendants, whether acting directly or through any

10   intermediary, are permanently restrained and enjoined from:

11        A.    Advertising, marketing, promoting, or offering for sale, or assisting in the

12   advertising, marketing, promoting, or offering for sale of any:

13             1.    Business opportunity;

14             2.    Work-at-home opportunity; or

15             3.    Service to assist in the creation, advertising, marketing, promotion,

16        or operation of a business opportunity or work-at-home opportunity, including

17        services such as lead generation, marketing campaign management, website

18        development, social media promotion, search engine optimization, training, and

19        business establishment services; and

20        B.    Holding any ownership interest in any business, other than a publicly-

21   traded company, that engages in or assists in advertising, marketing, promoting, or

22   offering for sale of any:

23             1.    Business opportunity;

24             2.    Work-at-home opportunity; or

25             3.    Service to assist in the creation, advertising, marketing, promotion,

26        or operation of a business opportunity or work-at-home opportunity, including

27        services such as lead generation, marketing campaign management, website

28        development, social media promotion, search engine optimization, training, and

business establishment services.

## II.

## PROHIBITION AGAINST MISREPRESENTATIONS

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any good or service are permanently restrained and enjoined from misrepresenting or assisting others in misrepresenting, expressly or by implication, any material fact, including but not limited to:

    A.    That purchasers of the good or service will earn income;

    B.    Any material term or condition of any refund or cancellation policy; and

    C.    Any other fact material to consumers concerning any good or service, such as:  costs; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics.

## III.

## PROHIBITION AGAINST ABUSIVE TELEMARKETING PRACTICES

IT IS FURTHER ORDERED that in connection with telemarketing, Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby permanently restrained and enjoined from engaging in, causing other persons to engage in, and assisting other persons to engage in, violations of the Telemarketing Sales Rule, including, but not limited to:

    A.    Initiating any outbound telephone call to any person at a telephone number on the National Do Not Call Registry unless Defendants prove that:

        1.    The telemarketing seller has obtained the express agreement, in writing, of such person to place calls to that person.  Such written agreement shall clearly evidence such person's authorization that calls made by or on behalf of a

specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature of that person; or

      2.     The telemarketing seller has an established business relationship with such person and that person has not previously stated that he or she does not wish to receive outbound telephone calls made by or on behalf of the telemarketing seller;

B.     Initiating any outbound telephone call to a telephone number within a given area code when the annual fee for access to the telephone numbers within that area code that are on the National Do Not Call Registry has not been paid by or on behalf of the telemarketing seller on whose behalf the telephone call is made, unless the telephone call is:

      1.     a solicitation to induce charitable contributions;

      2.     to a business; or

      3.     on behalf of a telemarketing seller who initiates, or causes others to initiate, telephone calls solely to (a) persons who have given the telemarketing seller their express agreement, in writing and signed, to receive calls from that telemarketing seller, or (b) persons who have an established business relationship with that telemarketing seller;

C.     Initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance with the call abandonment safe harbor in 16 C.F.R. § 310.4(b)(4)(iii), unless:

      1.     prior to making any such call to induce the purchase of any good or service, the telemarketing seller has obtained from the recipient of the call an express agreement, in writing, that:

           a.     the telemarketing seller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the telemarketing seller to place prerecorded calls to such person;

           b.     the telemarketing seller obtained without requiring, directly

or indirectly, that the agreement be executed as a condition of purchasing any good or service;

  c. evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific telemarketing seller; and

  d. includes such person's telephone number and signature; and

 2. in any such call to induce the purchase of any good or service, or to induce a charitable contribution from a member of, or previous donor to, a non-profit charitable organization on whose behalf the call is made, the telemarketing seller or telemarketer:

  a. allows the telephone to ring for at least 15 seconds or four rings before disconnecting an unanswered call; and

  b. within two seconds after the completed greeting of the person called, plays a prerecorded message that promptly provides the disclosures required by 16 C.F.R. § 310.4(d) or (e), followed immediately by a disclosure of one or both of the following:

   1) in the case of a call that could be answered in person by a consumer, that the person called can use an automated interactive voice and/or keypress-activated opt-out mechanism to assert a do-not-call request pursuant to 16 C.F.R. § 310.4(b)(1)(iii)(A) at any time during the message.  The mechanism must:

    a) automatically add the number called to the telemarketing seller's entity-specific Do Not Call list;

    b) once invoked, immediately disconnect the call;

    c) be available for use at any time during the message; and

   2) in the case of a call that could be answered by an

answering machine or voicemail service, that the person called can use a toll free-number to assert a do-not-call request pursuant to 16 C.F.R.§ 310.4(b)(1)(iii)(A).  The number provided must connect directly to an automated interactive voice or keypress-activated opt-out mechanism that:

a) automatically adds the number called to the telemarketing seller's entity-specific Do Not Call list;

b) immediately thereafter disconnects the call; and is accessible at any time throughout the duration of the telemarketing campaign; and

c) complies with all other requirements of the Telemarketing Sales Rule and other applicable federal and state laws.

## IV.

## MONETARY JUDGMENT AND PARTIAL SUSPENSION

IT IS FURTHER ORDERED that:

A.    Judgment in the amount of Five Million, Four Hundred Twenty-Four Thousand, Four Hundred Forty-Six Dollars ($5,424,446) is entered in favor of the Commission against Individual Defendant and Corporate Defendants, jointly and severally, as equitable monetary relief.

B.    Arizona Federal Credit Union is ordered, within seven days of entry of this Order, to transfer all funds held in the following accounts to the Commission by electronic fund transfer in accordance with instructions provided by a representative of the Commission:

1.    Account No. xx8501, held in the name of Shane Michael Hanna; and

2.    Account No. xx4972, held in the name of Shane Michael Hanna and Danelle A.  McKenney.

Individual Defendant is ordered to fully cooperate with Arizona Federal Credit Union and

the Commission in transferring such funds to the Commission, including promptly signing any document necessary or appropriate to transfer such funds to the Commission.

C.     Individual Defendant is ordered, within seven days of entry of this Order, to transfer possession of the Personal Property to the Receiver in accordance with instructions provided by the Commission or the Receiver to Individual Defendant.  The Receiver is authorized to promptly liquidate such property without further order of this Court and transfer the proceeds of the liquidation to the Commission.  Individual Defendant shall take all steps necessary to assist the Commission or the Receiver in the liquidation of such property, including signing any document necessary to transfer ownership.  In the event that it is necessary for Individual Defendant to execute documents to facilitate the liquidation of such property, he shall execute and return such documents within three days of a request from the Commission or the Receiver.

D.     Individual Defendant is ordered, within seven days of entry of this Order, to transfer possession of Individual Defendant's 2013 Cadillac Escalade ESV, identified in Item 16 of the Financial Statement of Individual Defendant dated November 20, 2013 to the Receiver.  The Receiver is authorized and directed to promptly liquidate the vehicle without further order of this Court and transfer the Vehicle Net Proceeds to the Commission after paying any remaining loan balance on the Cadillac to JP Morgan Chase Bank.  Individual Defendant is ordered to take all steps necessary to assist the Receiver in the sale of the Cadillac and shall not add any encumbrances to the vehicle.  In the event that it is necessary for Individual Defendant to execute documents to facilitate the liquidation of the vehicle, Individual Defendant is ordered to execute such documents within three days of a request from the Commission or the Receiver.  Individual Defendant is further ordered to maintain insurance on the Cadillac in an amount of not less than the full replacement amount of the vehicle until the vehicle is liquidated by the Receiver pursuant to this Subsection IV.D.  In the event that the Cadillac suffers any loss or damage covered by such insurance policy, Individual Defendant is ordered to make such claims that are permitted by the insurance policy and assign or remit any insurance

payment he receives as a result of such loss or damage to the Commission.  Individual Defendant is ordered to keep the Cadillac in good repair and to timely pay all registration fees, loan payments, and all other attendant expenses related to the maintenance and ownership of the vehicle until it is liquidated by the Receiver as required by this Subsection IV.D.

E.      Individual Defendant is ordered to liquidate the Phoenix Real Property and turn over all Real Property Net Proceeds to the Commission within seven days of the closing of any sale or auction by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission to Individual Defendant. In liquidating the Phoenix Real Property, Individual Defendant is ordered to:

1.      Market in a commercially reasonable manner and sell the Phoenix Real Property for fair market value within 90 days of entry of this Order.  In marketing the Phoenix Real Property, Individual Defendant is ordered to have the Phoenix Real Property listed on the multiple listing service until it is sold.

2.      In the event that the Phoenix Real Property does not sell as set forth in Subsection IV.E.1 of this Order, Individual Defendant is ordered to promptly have the Phoenix Real Property auctioned by an auction company at a public auction to be held as soon as practicable and, in no event, not more than 120 days from the date of entry of this Order.

3.      Individual Defendant is ordered to keep the Phoenix Real Property in good repair and to timely pay all taxes, fees, association dues, and all other attendant expenses related to the maintenance and ownership of the Phoenix Real Property until paying the Commission as required by this Subsection IV.E. Individual Defendant is further ordered to maintain insurance on the Phoenix Real Property in an amount not less than the full replacement value of the Phoenix Real Property until paying the Commission as required by this Subsection IV.E.  In the event the Phoenix Real Property suffers any loss or damage covered by such insurance policy, Individual Defendant is ordered to make such claims that are

permitted by the insurance policy and shall assign or remit any such insurance payment he receives as a result of such loss or damage to the Commission.

F.      Defendants hereby grant to the Commission all rights and claims they have to any asset currently in the possession, custody, or control of the Receiver, including, but not limited to, any customer lists, customer information, lead lists, computers, servers, and all funds transferred to the Receiver from the following accounts:

1.      Accounts at Arizona Federal Credit Union:

      a.      Account Number *8995, held in the name of Safe Card;

2.      Accounts at Bank of America:

      a.      Account Numbers *7782 and *7818, held in the name of Complete Market Share;

      b.      Account Numbers *6942, *6955 and *6968, held in the name of ENF, LLC;

      c.      Account Number *0310, held in the name of United Merchant; and

      d.      Account Numbers *4208, *6560, *6573 and *6710, held in the name of Universal Marketing;

3.      Accounts at Compass Bank:

      a.      Account Number *7403, held in the name of American Business Builders; and

      b.      Account Number *9972, held in the name of UMS Group;

4.      Accounts at EVO Merchant Services, LLC:

      a.      Account Number *0344, held in the name of Pinnacle Marketing Group; and

      b.      Account Numbers *2266 and *2464, held in the name of Safe Card, LLC;

5.      Accounts at Global Payments Direct, Inc.:

      a.      Account Number *2317, held in the name of American

Business Brokers, doing business as UMS;

        b.     Account Number *9327, held in the name of Cash Flow Capital;

        c.     Account Number *9241, held in the name of E3Biz, LLC;

        d.     Account Number *3823, held in the name of Pinnacle Marketing; and

     6.     Accounts at Nevada State Bank:

        a.     Account Numbers *2702, *2710, *2728 and 4047, held in the name of American Business Brokers; and

        b.     Account Numbers *4054, *4062, *4070 and *4088, held in the name of ENF, LLC.

     G.     Defendants hereby grant to the Commission all rights and claims they have to any funds, including any funds held in a reserve account or as a reserve balance, in the possession of any person, including any financial institution, and specifically including Global Payments Direct, Inc., Trust One Payment Services, Inc., and HSBC Bank USA.

     H.     Upon such payment and all other asset transfers set forth in Subsections IV.B through IV.G of this Order, the remainder of the judgment as to Individual Defendant and UMS Group, LLC is suspended, subject to the Subsections below.

     I.     The Commission's agreement to the suspension of part of the judgment is expressly premised upon the truthfulness, accuracy, and completeness of Individual Defendant's and UMS Group, LLC's sworn financial statements and related documents (collectively, "financial representations") submitted to the Commission, namely:

     1.     The Financial Statement of Individual Defendant signed on November 20, 2013, including all attachments, submitted via email on November 20, 2013, at 1:01 pm;

     2.     The supplemental Financial Statement of Individual Defendant submitted via email on March 3, 2014, at 4:13 pm;

     3.     The deposition of Shane Michael Hanna taken by counsel for the

1    Commission on December 12, 2012;

2        4.    The Financial Statement of UMS Group, LLC, signed by Individual

3    Defendant on July 2, 2013 and submitted via email on July 2, 2013, at 1:54 pm;

4    and

5        5.    All other documents identified on Appendix A attached hereto.

6        J.    The suspension of the judgment will be lifted as to any Defendant if, upon

7    motion by the Commission, the Court finds that Defendant failed to disclose any material

8    asset, materially misstated the value of any asset, or made any other material

9    misstatement or omission in the financial representations identified above.

10        K.    If the suspension of the judgment is lifted, the judgment becomes

11    immediately due as to that Defendant in the amount specified in Subsection IV.A above

12    (which the parties stipulate only for purposes of this Section represents the consumer

13    injury alleged in the Complaint), less any payment previously made pursuant to this

14    Section, plus interest computed from the date of entry of this Order.

15    **V.**

16    **ADDITIONAL MONETARY PROVISIONS**

17    IT IS FURTHER ORDERED that:

18        A.    Defendants relinquish dominion and all legal and equitable right, title, and

19    interest in all assets transferred pursuant to this Order and may not seek the return of any

20    assets.

21        B.    The facts alleged in the Complaint will be taken as true, without further

22    proof, in any subsequent civil litigation by or on behalf of the Commission, including in a

23    proceeding to enforce its rights to any payment or monetary judgment pursuant to this

24    Order, such as a nondischargeability complaint in any bankruptcy case.

25        C.    The facts alleged in the Complaint establish all elements necessary to

26    sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy

27    Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for

28    such purposes.

D.      Defendants acknowledge that their Taxpayer Identification Numbers (Social Security Numbers or Employer Identification Numbers), which Defendants previously submitted to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

E.      All money paid to the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for equitable relief, including consumer redress and any attendant expenses for the administration of any redress fund.  If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed, the Commission may apply any remaining money for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint.  Any money not used for such equitable relief is to be deposited to the U.S. Treasury as disgorgement.  Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

F.      The asset freeze set forth in Section III of the Preliminary Injunction shall remain in full force and effect until the completion of all payments and transfers set forth in Section IV of this Order, except that the asset freeze is modified to permit the payments and transfers identified in Section IV of this Order.  Upon completion of all payments and transfers required by Section IV of this Order, the asset freeze as to Defendants is dissolved.

G.      If any Defendant fails to pay fully the amount due at the time specified, Defendants must cooperate fully with the Commission and their representatives in all attempts to collect the judgment.  In such an event, Defendants agree to provide federal and state tax returns for the preceding two years, and to complete new financial disclosure forms fully and accurately within 10 business days of receiving a request from the Commission.  Defendants further authorize the Commission to verify all information provided on their financial disclosure forms with all appropriate third parties, including

1   financial institutions.

2   ## VI.

3   ## CUSTOMER INFORMATION

4   IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants,

5   employees, and attorneys, and all other persons in active concert of participation with any

6   of them, who receive actual notice of this Order, are permanently restrained and enjoined

7   from directly or indirectly:

8   A.     Failing to provide sufficient customer information to enable the

9   Commission to efficiently administer consumer redress.  If a representative of the

10  Commission requests in writing any information related to redress, Defendants must

11  provide it, in the form prescribed by the Commission, within 14 days.

12  B.     Disclosing, using, or benefitting from customer or consumer lead

13  information, including the name, address, telephone number, email address, social

14  security number, other identifying information, or any data that enables access to a

15  customer's account (including a credit card, bank account, or other financial account),

16  that any Defendant obtained prior to entry of this Order; and

17  C.     Failing to destroy such customer or consumer lead information in all forms

18  in their possession, custody, or control within 30 days after receipt of written direction to

19  do so from a representative of the Commission.

20  *Provided*, *however*, that customer information need not be disposed of, and may be

21  disclosed, to the extent requested by a government agency or required by law, regulation,

22  or court order.

23  ## VII.

24  ## COOPERATION

25  IT IS FURTHER ORDERED that:

26  A.     Defendants must fully cooperate with representatives of the Commission in

27  this case and in any investigation related to or associated with the transactions or the

28  occurrences that are the subject of the Complaint.  Defendants must also fully cooperate

with representatives of the Commission in obtaining possession of any assets granted to the Commission by Defendants, including any funds held in a reserve account or as a reserve balance by Global Payments Direct, Inc., Trust One Payment Services, Inc., HSBC Bank USA, or any other person.  Defendants must provide truthful and complete information, evidence, and testimony.  Individual Defendant must appear and Corporate Defendants must cause Corporate Defendants' officers, employees, representatives, or agents to appear for interviews, discovery, hearings, trials, and any other proceedings that a Commission representative may reasonably request upon five days written notice, or other reasonable notice, at such places and times as a Commission representative may designate, without the service of a subpoena;

      B.    Defendants must fully cooperate with the Receiver as set forth in Section XII of the Preliminary Injunction until the receivership is dissolved.

/ / /

# VIII.
## ORDER ACKNOWLEDGMENTS

      IT IS FURTHER ORDERED that Defendants obtain acknowledgments of receipt of this Order.

      A.    Each Defendant, within seven days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

      B.    For five years after entry of this Order, Individual Defendant for any business that such Individual Defendant (individually or collectively with any other Defendant, Spratt Defendant, or any person who worked for any Defendant or Spratt Defendant) is the majority owner or controls directly or indirectly, and each Corporate Defendant, must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees, agents, and representatives who participate in conduct related to the subject matter of this Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance

Reporting.   Delivery must occur within seven days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.     From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## IX.

## COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Defendants make timely submissions to the Commission:

A.     One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury:

1.     Each Defendant must:  (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with such Defendant; (b) identify all of such Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant (which Individual Defendants must describe if they know or should know due to their own involvement); (d) describe in detail whether and how such Defendant is in compliance with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

2.     Additionally, each Individual Defendant must:  (a) identify all his telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise, and any entity in which such Defendant has any ownership interest; and (c) describe in

detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B.      For 20 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.      Each Defendant must report any change in:  (a) any designated point of contact; or (b) the structure of any Corporate Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

2.      Additionally, each Individual Defendant must report any change in: (a) name, including aliases or fictitious name, or residence address; or (b) title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise, and any entity in which such Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity.

C.      Each Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.      Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on:  _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.      Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to:  Associate

Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.  The subject line must begin: FTC v. American Business Builders, LLC, et al., X130017.

## X.

## RECORDKEEPING

IT IS FURTHER ORDERED that Defendants must create certain records for 20 years after entry of the Order, and retain each such record for five years.  Specifically, Corporate Defendants and Individual Defendant for any business that such Defendant (individually or collectively with any other Defendant, Spratt Defendant, or any person who worked for any Defendant or Spratt Defendant) is a majority owner or controls directly or indirectly, must create and retain the following records:

A.     Accounting records showing the revenues from all goods or services sold;

B.     Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's:  name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.     Records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

D.     Records of all chargeback requests;

E.     Copies of all sales scripts, training materials, advertisements, or other marketing materials;

F.     Copies of all merchant card applications and agreements; and

G.     All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission.

## XI.

## COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Defendants' compliance with this Order, including the financial representations upon which part of the judgment was suspended and any failure to transfer any assets as required by this

1  Order:

2      A.     Within 14 days of receipt of a written request from a representative of the

3  Commission, each Defendant must:  submit additional compliance reports or other

4  requested information, which must be sworn under penalty of perjury; appear for

5  depositions; and produce documents for inspection and copying.  The Commission is also

6  authorized to obtain discovery, without further leave of court, using any of the procedures

7  prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions),

8  31, 33, 34, 36, 45, and 69.

9      B.     For matters concerning this Order, the Commission is authorized to

10 communicate directly with each Defendant.  Defendant must permit representatives of the

11 Commission to interview any employee or other person affiliated with any Defendant

12 who has agreed to such an interview.  The person interviewed may have counsel present.

13     C.     The Commission may use all other lawful means, including posing, through

14 its representatives as consumers, suppliers, or other individuals or entities, to Defendants

15 or any individual or entity affiliated with Defendants, without the necessity of

16 identification or prior notice.  Nothing in this Order limits the Commission's lawful use

17 of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49,

18 57b-1.

19                                   **XII.**

20                            **RECEIVERSHIP**

21     IT IS FURTHER ORDERED that:

22     A.     Robb Evans and Associates, LLC, shall continue as Receiver over the

23 Corporate Defendants as set forth in Section X of the Preliminary Injunction;

24     B.     The Receiver is authorized and directed to liquidate all assets and finalize

25 the affairs of the Corporate Defendants as soon as practicable;

26     C.     Upon liquidation of Corporate Defendants' assets and finalizing the affairs

27 of the Corporate Defendants, the Receiver shall submit (1) a final report describing the

28 Receivers' activities and (2) a final application for compensation;

1         D.      Upon the Court's approval of the Receiver's final application for

2    compensation, the Receiver is ordered, within 14 days, to pay all remaining funds,

3    Recreational Vehicle Net Proceeds, Vehicle Net Proceeds, and the proceeds of the

4    liquidation of the Personal Property to the Commission by electronic fund transfer in

5    accordance with instructions provided by a representative of the Commission to the

6    Receiver in partial satisfaction of the Judgment in Section IV; and

7         E.      Upon termination of the Receivership and with at least 14 days notice to

8    counsel for the Commission, the Receiver may dispose of or destroy any records and

9    documents of the Corporate Defendants in the Receiver's possession, custody, or control

10    as the Receiver sees fit, except any documents or records that the Commission directs the

11    Receiver to transfer to the Commission or its designee.  The Commission or its designee

12    may dispose of or destroy any records and documents received from the Receiver as it

13    sees fit.

## XIII.

### RETENTION OF JURISDICTION

16    IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for

17    purposes of construction, modification, and enforcement of this Order.

18    Dated this 19th day of May, 2014.

G. Murray Snow
United States District Judge

**Appendix A**

The following documents are part of the financial representations submitted to the Commission as set forth in Section IV.I of the Order:

1. All documents and information submitted via email on April 2, 2014, at 4:05 pm including photographs of Individual Defendant's Cadillac Escalade;

2. All documents and information submitted via email on February 4, 2014, at 4:07 pm and January 27, 2014, at 9:16 am, including statements concerning Individual Defendant's prior employment;

3. The September 27, 2013 letter from Booker T. Evans regarding Individual Defendant's Second Supplemental Response/Objections to Plaintiff's Request for Production of Documents submitted via email on September 27, 2013, at 5:29 pm;

4. The September 11, 2013 Supplemental Responses/Objections to Plaintiff's Request for Production of Documents submitted via email on September 11, 2013, at 10:29 am, including the verification signed by Individual Defendant;

5. All documents and information submitted via email on August 20, 2013, at 2:41 pm, including documents from BBVA Compass bank;

6. The August 13, 2013 Responses/Objections to Plaintiff's Request for Production of Documents submitted via email on August 13, 2013, at 1:29 pm;

7. All documents and information submitted via email on August 9, 2013, at 11:57 am, including the statement concerning Individual Defendant's employment;

8. All documents and information submitted via email on August 7, 2013, at 9:41 am;

9. All documents and information submitted via email on July 16, 2013, at 11:23 am, including documents from BBVA Compass bank;

10. All documents and information submitted via email on July 2, 2013, at 1:53 pm;

11. All documents and information submitted on June 26, 2013, at 11:34 am, including documents from Franklin American Mortgage Company and City First Mortgage Services, LLC;

12. All documents and information submitted on June 24, 2013, at 6:36 pm, including documents from BBVA Compass bank;

13. All documents and information submitted via email on May 28, 2013, at 2:19 pm, including attachments A through Q;

14. All documents and information submitted on April 23, 2013, at 4:10 pm, 4:07 pm, and 4:06 pm, including information concerning the safe deposit box of Danelle McKenney and the 2012 tax returns of Individual Defendant and Danelle McKenney;

15. All information submitted via email on April 17, 2013, at 10:16 am;

16. All documents and information submitted via email on April 10, 2013, at 4:40 pm, including invoices and the statement of Individual Defendant;

17. All documents and information submitted via email on March 14, 2013, at 4:10 pm, including the response to the Commission's letter dated March 6, 2013, the statement of Individual Defendant, and the spreadsheet;

18. The notebook of information submitted on February 25, 2013;

19. All documents and information submitted via email on February 7, 2013, at 2:53 pm and 4:31 pm, including the personal statement and spreadsheet;

20. All documents and information submitted via email on January 2, 2013, at 5:23 pm, including account statements, loan statements, credit card statements, and spreadsheets;

21. All documents and information submitted via email on December 10, 2012, at 3:06 pm and 3:07 pm, including the 2011 tax return of Individual Defendant and Danelle McKenney, the 2011 tax return for E-Biz Financial Group, LLC, the 2010 tax return of Individual Defendant, the financial statements for American Business Builders, LLC; United Merchant Services, LLC; UMS Group, LLC; and Unlimited Training Services, LLC; and

/ / /

/ / /

All documents and information submitted via email on November 15, 2012, at 3:36 pm, including the 2011 form 1099-Misc to Individual Defendant from PMG Marketing Group, LLC.

Appendix B

## ALTERNATIVE FUELED VEHICLE BUYERS GUIDE

### Before Selecting An Alternative Fueled Vehicle Consider:

☑   **FUEL TYPE AND AVAILABILITY:** Know which fuel(s) power this vehicle. Determine whether refueling and/or recharging facilities that meet your driving needs are readily available.

☑   **OPERATING COSTS:** Fuel and maintenance costs for AFVs differ from gasoline or diesel-fueled vehicles and can vary considerably. Visit www.fueleconomy.gov.

☑   **PERFORMANCE/CONVENIENCE:** Vehicles powered by different fuels differ in their ability to start a cold engine, how long it takes to refill the vehicle's tank to full capacity, acceleration rates, and refueling methods.

☑   **ENERGY SECURITY/RENEWABILITY:** Consider where and how the fuel powering this vehicle is typically produced.

☑   **EMISSIONS:** Emissions are an important factor. For more information about how the vehicle you are considering compares to others, visit www.epa.gov/greenvehicle.

**Additional Information**

**DEPARTMENT OF ENERGY (DOE)**
For more information about AFVs, contact DOE's National Alternative Fuels Hotline, 1-800-423-1DOE, or visit DOE's Alternative Fuels Data Center website, www.afdc.doe.gov.

**NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION (NHTSA)**
For more information about vehicle safety, contact NHTSA's Auto Safety Hotline, 1-800-424-9393.

The information on this label is required by the Federal Trade Commission, 16 CFR Part 309.
For more information call toll-free (877) FTC-HELP or visit www.ftc.gov.

↑ 7.5 inches ↓

← 7 inches →

**Figure 6**

[60 FR 26955, May 19, 1995, as amended at 69 FR 55339, Sept. 14, 2004]

## PART 310—TELEMARKETING SALES RULE 16 CFR PART 310

Sec.
310.1   Scope of regulations in this part.
310.2   Definitions.
310.3   Deceptive telemarketing acts or practices.
310.4   Abusive telemarketing acts or practices.
310.5   Recordkeeping requirements.
310.6   Exemptions.
310.7   Actions by states and private persons.
310.8   Fee for access to the National Do Not Call Registry.
310.9   Severability.

AUTHORITY: 15 U.S.C. 6101–6108.

SOURCE: 75 FR 48516, Aug. 10, 2010, unless otherwise noted.

### § 310.1   Scope of regulations in this part.

This part implements the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101–6108, as amended.

370

# Appendix B

**§310.2   Definitions.**

(a) *Acquirer* means a business organization, financial institution, or an agent of a business organization or financial institution that has authority from an organization that operates or licenses a credit card system to authorize merchants to accept, transmit, or process payment by credit card through the credit card system for money, goods or services, or anything else of value.

(b) *Attorney General* means the chief legal officer of a state.

(c) *Billing information* means any data that enables any person to access a customer's or donor's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

(d) *Caller identification service* means a service that allows a telephone subscriber to have the telephone number, and, where available, name of the calling party transmitted contemporaneously with the telephone call, and displayed on a device in or connected to the subscriber's telephone.

(e) *Cardholder* means a person to whom a credit card is issued or who is authorized to use a credit card on behalf of or in addition to the person to whom the credit card is issued.

(f) *Charitable contribution* means any donation or gift of money or any other thing of value.

(g) *Commission* means the Federal Trade Commission.

(h) *Credit* means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

(i) *Credit card* means any card, plate, coupon book, or other credit device existing for the purpose of obtaining money, property, labor, or services on credit.

(j) *Credit card sales draft* means any record or evidence of a credit card transaction.

(k) *Credit card system* means any method or procedure used to process credit card transactions involving credit cards issued or licensed by the operator of that system.

(l) *Customer* means any person who is or may be required to pay for goods or services offered through telemarketing.

(m) *Debt relief service* means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.

(n) *Donor* means any person solicited to make a charitable contribution.

(o) *Established business relationship* means a relationship between a seller and a consumer based on:

(1) the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the eighteen (18) months immediately preceding the date of a telemarketing call; or

(2) the consumer's inquiry or application regarding a product or service offered by the seller, within the three (3) months immediately preceding the date of a telemarketing call.

(p) *Free-to-pay conversion* means, in an offer or agreement to sell or provide any goods or services, a provision under which a customer receives a product or service for free for an initial period and will incur an obligation to pay for the product or service if he or she does not take affirmative action to cancel before the end of that period.

(q) *Investment opportunity* means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

(r) *Material* means likely to affect a person's choice of, or conduct regarding, goods or services or a charitable contribution.

(s) *Merchant* means a person who is authorized under a written contract with an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

(t) *Merchant agreement* means a written contract between a merchant and an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the

371

# Appendix B

purchase of goods or services or a charitable contribution.

(u) *Negative option feature* means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer.

(v) *Outbound telephone call* means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.

(w) *Person* means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity.

(x) *Preacquired account information* means any information that enables a seller or telemarketer to cause a charge to be placed against a customer's or donor's account without obtaining the account number directly from the customer or donor during the telemarketing transaction pursuant to which the account will be charged.

(y) *Prize* means anything offered, or purportedly offered, and given, or purportedly given, to a person by chance. For purposes of this definition, chance exists if a person is guaranteed to receive an item and, at the time of the offer or purported offer, the telemarketer does not identify the specific item that the person will receive.

(z) *Prize promotion* means:

(1) A sweepstakes or other game of chance; or

(2) An oral or written express or implied representation that a person has won, has been selected to receive, or may be eligible to receive a prize or purported prize.

(aa) *Seller* means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.

(bb) *State* means any state of the United States, the District of Columbia, Puerto Rico, the Northern Mariana Islands, and any territory or possession of the United States.

(cc) *Telemarketer* means any person who, in connection with telemarketing,

initiates or receives telephone calls to or from a customer or donor.

(dd) *Telemarketing* means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. The term does not include the solicitation of sales through the mailing of a catalog which: contains a written description or illustration of the goods or services offered for sale; includes the business address of the seller; includes multiple pages of written material or illustrations; and has been issued not less frequently than once a year, when the person making the solicitation does not solicit customers by telephone but only receives calls initiated by customers in response to the catalog and during those calls takes orders only without further solicitation. For purposes of the previous sentence, the term "further solicitation" does not include providing the customer with information about, or attempting to sell, any other item included in the same catalog which prompted the customer's call or in a substantially similar catalog.

(ee) *Upselling* means soliciting the purchase of goods or services following an initial transaction during a single telephone call. The upsell is a separate telemarketing transaction, not a continuation of the initial transaction. An "external upsell" is a solicitation made by or on behalf of a seller different from the seller in the initial transaction, regardless of whether the initial transaction and the subsequent solicitation are made by the same telemarketer. An "internal upsell" is a solicitation made by or on behalf of the same seller as in the initial transaction, regardless of whether the initial transaction and subsequent solicitation are made by the same telemarketer.

# Appendix B

## § 310.3  Deceptive telemarketing acts or practices.

(a) *Prohibited deceptive telemarketing acts or practices.* It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

(1) Before a customer consents to pay[659] for goods or services offered, failing to disclose truthfully, in a clear and conspicuous manner, the following material information:

(i) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer;[660]

(ii) All material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer;

(iii) If the seller has a policy of not making refunds, cancellations, exchanges, or repurchases, a statement informing the customer that this is the seller's policy; or, if the seller or telemarketer makes a representation about a refund, cancellation, exchange, or repurchase policy, a statement of all material terms and conditions of such policy;

(iv) In any prize promotion, the odds of being able to receive the prize, and, if the odds are not calculable in advance, the factors used in calculating the odds; that no purchase or payment is required to win a prize or to participate in a prize promotion and that any purchase or payment will not increase the person's chances of winning; and the no-purchase/no-payment method of

participating in the prize promotion with either instructions on how to participate or an address or local or toll-free telephone number to which customers may write or call for information on how to participate;

(v) All material costs or conditions to receive or redeem a prize that is the subject of the prize promotion;

(vi) In the sale of any goods or services represented to protect, insure, or otherwise limit a customer's liability in the event of unauthorized use of the customer's credit card, the limits on a cardholder's liability for unauthorized use of a credit card pursuant to 15 U.S.C. 1643;

(vii) If the offer includes a negative option feature, all material terms and conditions of the negative option feature, including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s); and

(viii) In the sale of any debt relief service:

(A) the amount of time necessary to achieve the represented results, and to the extent that the service may include a settlement offer to any of the customer's creditors or debt collectors, the time by which the debt relief service provider will make a bona fide settlement offer to each of them;

(B) to the extent that the service may include a settlement offer to any of the customer's creditors or debt collectors, the amount of money or the percentage of each outstanding debt that the customer must accumulate before the debt relief service provider will make a bona fide settlement offer to each of them;

(C) to the extent that any aspect of the debt relief service relies upon or results in the customer's failure to make timely payments to creditors or debt collectors, that the use of the debt relief service will likely adversely affect the customer's creditworthiness, may result in the customer being subject to collections or sued by creditors or debt collectors, and may increase the amount of money the customer owes

---

[659] When a seller or telemarketer uses, or directs a customer to use, a courier to transport payment, the seller or telemarketer must make the disclosures required by § 310.3(a)(1) before sending a courier to pick up payment or authorization for payment, or directing a customer to have a courier pick up payment or authorization for payment. In the case of debt relief services, the seller or telemarketer must make the disclosures required by § 310.3(a)(1) before the consumer enrolls in an offered program.

[660] For offers of consumer credit products subject to the Truth in Lending Act, 15 U.S.C. 1601 et seq., and Regulation Z, 12 CFR 226, compliance with the disclosure requirements under the Truth in Lending Act and Regulation Z shall constitute compliance with § 310.3(a)(1)(i) of this Rule.

# Appendix B

due to the accrual of fees and interest; and

(D) to the extent that the debt relief service requests or requires the customer to place funds in an account at an insured financial institution, that the customer owns the funds held in the account, the customer may withdraw from the debt relief service at any time without penalty, and, if the customer withdraws, the customer must receive all funds in the account, other than funds earned by the debt relief service in compliance with § 310.4(a)(5)(i)(A) through (C).

(2) Misrepresenting, directly or by implication, in the sale of goods or services any of the following material information:

(i) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer;

(ii) Any material restriction, limitation, or condition to purchase, receive, or use goods or services that are the subject of a sales offer;

(iii) Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer;

(iv) Any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies;

(v) Any material aspect of a prize promotion including, but not limited to, the odds of being able to receive a prize, the nature or value of a prize, or that a purchase or payment is required to win a prize or to participate in a prize promotion;

(vi) Any material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability;

(vii) A seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity;

(viii) That any customer needs offered goods or services to provide protections a customer already has pursuant to 15 U.S.C. 1643;

(ix) Any material aspect of a negative option feature including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s); or

(x) Any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service; the amount of time necessary to achieve the represented results; the amount of money or the percentage of each outstanding debt that the customer must accumulate before the provider of the debt relief service will initiate attempts with the customer's creditors or debt collectors or make a bona fide offer to negotiate, settle, or modify the terms of the customer's debt; the effect of the service on a customer's creditworthiness; the effect of the service on collection efforts of the customer's creditors or debt collectors; the percentage or number of customers who attain the represented results; and whether a debt relief service is offered or provided by a non-profit entity.

(3) Causing billing information to be submitted for payment, or collecting or attempting to collect payment for goods or services or a charitable contribution, directly or indirectly, without the customer's or donor's express verifiable authorization, except when the method of payment used is a credit card subject to protections of the Truth in Lending Act and Regulation Z,[661] or a debit card subject to the protections of the Electronic Fund Transfer Act and Regulation E.[662] Such authorization shall be deemed verifiable if any of the following means is employed:

(i) Express written authorization by the customer or donor, which includes the customer's or donor's signature;[663]

[661] Truth in Lending Act, 15 U.S.C. 1601 et seq., and Regulation Z, 12 CFR part 226.
[662] Electronic Fund Transfer Act, 15 U.S.C. 1693 et seq., and Regulation E, 12 CFR part 205.
[663] For purposes of this Rule, the term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

374

# Appendix B

(ii) Express oral authorization which is audio-recorded and made available upon request to the customer or donor, and the customer's or donor's bank or other billing entity, and which evidences clearly both the customer's or donor's authorization of payment for the goods or services or charitable contribution that are the subject of the telemarketing transaction and the customer's or donor's receipt of all of the following information:

(A) The number of debits, charges, or payments (if more than one);

(B) The date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;

(C) The amount(s) of the debit(s), charge(s), or payment(s);

(D) The customer's or donor's name;

(E) The customer's or donor's billing information, identified with sufficient specificity such that the customer or donor understands what account will be used to collect payment for the goods or services or charitable contribution that are the subject of the telemarketing transaction;

(F) A telephone number for customer or donor inquiry that is answered during normal business hours; and

(G) The date of the customer's or donor's oral authorization; or

(iii) Written confirmation of the transaction, identified in a clear and conspicuous manner as such on the outside of the envelope, sent to the customer or donor via first class mail prior to the submission for payment of the customer's or donor's billing information, and that includes all of the information contained in §§310.3(a)(3)(ii)(A)-(G) and a clear and conspicuous statement of the procedures by which the customer or donor can obtain a refund from the seller or telemarketer or charitable organization in the event the confirmation is inaccurate; provided, however, that this means of authorization shall not be deemed verifiable in instances in which goods or services are offered in a transaction involving a free-to-pay conversion and preacquired account information.

(4) Making a false or misleading statement to induce any person to pay for goods or services or to induce a charitable contribution.

(b) *Assisting and facilitating.* It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§310.3(a), (c) or (d), or §310.4 of this Rule.

(c) *Credit card laundering.* Except as expressly permitted by the applicable credit card system, it is a deceptive telemarketing act or practice and a violation of this Rule for:

(1) A merchant to present to or deposit into, or cause another to present to or deposit into, the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant;

(2) Any person to employ, solicit, or otherwise cause a merchant, or an employee, representative, or agent of the merchant, to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or

(3) Any person to obtain access to the credit card system through the use of a business relationship or an affiliation with a merchant, when such access is not authorized by the merchant agreement or the applicable credit card system.

(d) *Prohibited deceptive acts or practices in the solicitation of charitable contributions.* It is a fraudulent charitable solicitation, a deceptive telemarketing act or practice, and a violation of this Rule for any telemarketer soliciting charitable contributions to misrepresent, directly or by implication, any of the following material information:

(1) The nature, purpose, or mission of any entity on behalf of which a charitable contribution is being requested;

(2) That any charitable contribution is tax deductible in whole or in part;

(3) The purpose for which any charitable contribution will be used;

(4) The percentage or amount of any charitable contribution that will go to

375

# Appendix B

a charitable organization or to any particular charitable program;

(5) Any material aspect of a prize promotion including, but not limited to: the odds of being able to receive a prize; the nature or value of a prize; or that a charitable contribution is required to win a prize or to participate in a prize promotion; or

(6) A charitable organization's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.

## § 310.4 Abusive telemarketing acts or practices.

(a) *Abusive conduct generally.* It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

(1) Threats, intimidation, or the use of profane or obscene language;

(2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:

(i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and

(ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. Nothing in this Rule should be construed to affect the requirement in the Fair Credit Reporting Act, 15 U.S.C. 1681, that a consumer report may only be obtained for a specified permissible purpose;

(3) Requesting or receiving payment of any fee or consideration from a person for goods or services represented to recover or otherwise assist in the return of money or any other item of value paid for by, or promised to, that person in a previous telemarketing transaction, until seven (7) business days after such money or other item is delivered to that person. This provision shall not apply to goods or services provided to a person by a licensed attorney;

(4) Requesting or receiving payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit for a person;

(5)(i) Requesting or receiving payment of any fee or consideration for any debt relief service until and unless:

(A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

(B) The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

(C) To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

(1) Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

(2) Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt.

(ii) Nothing in § 310.4(a)(5)(i) prohibits requesting or requiring the customer to place funds in an account to be used for the debt relief provider's fees and for payments to creditors or debt collectors in connection with the renegotiation, settlement, reduction, or other alteration of the terms of payment or other terms of a debt, provided that:

(A) The funds are held in an account at an insured financial institution;

# Appendix B

(B) The customer owns the funds held in the account and is paid accrued interest on the account, if any;

(C) The entity administering the account is not owned or controlled by, or in any way affiliated with, the debt relief service;

(D) The entity administering the account does not give or accept any money or other compensation in exchange for referrals of business involving the debt relief service; and

(E) The customer may withdraw from the debt relief service at any time without penalty, and must receive all funds in the account, other than funds earned by the debt relief service in compliance with § 310.4(a)(5)(i)(A) through (C), within seven (7) business days of the customer's request.

(6) Disclosing or receiving, for consideration, unencrypted consumer account numbers for use in telemarketing; provided, however, that this paragraph shall not apply to the disclosure or receipt of a customer's or donor's billing information to process a payment for goods or services or a charitable contribution pursuant to a transaction;

(7) Causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer or donor. In any telemarketing transaction, the seller or telemarketer must obtain the express informed consent of the customer or donor to be charged for the goods or services or charitable contribution and to be charged using the identified account. In any telemarketing transaction involving preacquired account information, the requirements in paragraphs (a)(7)(i) through (ii) of this section must be met to evidence express informed consent.

(i) In any telemarketing transaction involving preacquired account information and a free-to-pay conversion feature, the seller or telemarketer must:

(A) Obtain from the customer, at a minimum, the last four (4) digits of the account number to be charged;

(B) Obtain from the customer his or her express agreement to be charged for the goods or services and to be charged using the account number pursuant to paragraph (a)(7)(i)(A) of this section; and,

(C) Make and maintain an audio recording of the entire telemarketing transaction.

(ii) In any other telemarketing transaction involving preacquired account information not described in paragraph (a)(7)(i) of this section, the seller or telemarketer must:

(A) At a minimum, identify the account to be charged with sufficient specificity for the customer or donor to understand what account will be charged; and

(B) Obtain from the customer or donor his or her express agreement to be charged for the goods or services and to be charged using the account number identified pursuant to paragraph (a)(7)(ii)(A) of this section; or

(8) Failing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call; provided that it shall not be a violation to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller or charitable organization on behalf of which a telemarketing call is placed, and the seller's or charitable organization's customer or donor service telephone number, which is answered during regular business hours.

(b) *Pattern of calls.* (1) It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in, the following conduct:

(i) Causing any telephone to ring, or engaging any person in telephone conversation, repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number;

(ii) Denying or interfering in any way, directly or indirectly, with a person's right to be placed on any registry of names and/or telephone numbers of persons who do not wish to receive outbound telephone calls established to comply with § 310.4(b)(1)(iii);

(iii) Initiating any outbound telephone call to a person when:

(A) That person previously has stated that he or she does not wish to receive an outbound telephone call made by or

# Appendix B

on behalf of the seller whose goods or services are being offered or made on behalf of the charitable organization for which a charitable contribution is being solicited; or

(B) That person's telephone number is on the "do-not-call" registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services unless the seller:

(i) Has obtained the express agreement, in writing, of such person to place calls to that person. Such written agreement shall clearly evidence such person's authorization that calls made by or on behalf of a specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature[664] of that person; or

(ii) Has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls under paragraph (b)(1)(iii)(A) of this section; or

(iv) Abandoning any outbound telephone call. An outbound telephone call is "abandoned" under this section if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting.

(v) Initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance with the call abandonment safe harbor in § 310.4(b)(4)(iii), unless:

(A) In any such call to induce the purchase of any good or service, the seller has obtained from the recipient of the call an express agreement, in writing, that:

(i) The seller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person;

(ii) The seller obtained without requiring, directly or indirectly, that the

agreement be executed as a condition of purchasing any good or service;

(iii) Evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller; and

(iv) Includes such person's telephone number and signature;[665] and

(B) In any such call to induce the purchase of any good or service, or to induce a charitable contribution from a member of, or previous donor to, a nonprofit charitable organization on whose behalf the call is made, the seller or telemarketer:

(i) Allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call; and

(ii) Within two (2) seconds after the completed greeting of the person called, plays a prerecorded message that promptly provides the disclosures required by § 310.4(d) or (e), followed immediately by a disclosure of one or both of the following:

(A) In the case of a call that could be answered in person by a consumer, that the person called can use an automated interactive voice and/or keypress-activated opt-out mechanism to assert a Do Not Call request pursuant to § 310.4(b)(1)(iii)(A) at any time during the message. The mechanism must:

(1) Automatically add the number called to the seller's entity-specific Do Not Call list;

(2) Once invoked, immediately disconnect the call; and

(3) Be available for use at any time during the message; and

(B) In the case of a call that could be answered by an answering machine or voicemail service, that the person called can use a toll-free telephone number to assert a Do Not Call request pursuant to § 310.4(b)(1)(iii)(A). The number provided must connect directly to an automated interactive voice or keypress-activated opt-out mechanism that:

---

[664] For purposes of this Rule, the term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

[665] For purposes of this Rule, the term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

378

# Appendix B

**Federal Trade Commission** §310.4

(1) Automatically adds the number called to the seller's entity-specific Do Not Call list;

(2) Immediately thereafter disconnects the call; and

(3) Is accessible at any time throughout the duration of the telemarketing campaign; and

(iii) Complies with all other requirements of this part and other applicable federal and state laws.

(C) Any call that complies with all applicable requirements of this paragraph (v) shall not be deemed to violate §310.4(b)(1)(iv) of this part.

(D) This paragraph (v) shall not apply to any outbound telephone call that delivers a prerecorded healthcare message made by, or on behalf of, a covered entity or its business associate, as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

(2) It is an abusive telemarketing act or practice and a violation of this Rule for any person to sell, rent, lease, purchase, or use any list established to comply with §310.4(b)(1)(iii)(A), or maintained by the Commission pursuant to §310.4(b)(1)(iii)(B), for any purpose except compliance with the provisions of this Rule or otherwise to prevent telephone calls to telephone numbers on such lists.

(3) A seller or telemarketer will not be liable for violating §310.4(b)(1)(ii) and (iii) if it can demonstrate that, as part of the seller's or telemarketer's routine business practice:

(i) It has established and implemented written procedures to comply with §310.4(b)(1)(ii) and (iii);

(ii) It has trained its personnel, and any entity assisting in its compliance, in the procedures established pursuant to §310.4(b)(3)(i);

(iii) The seller, or a telemarketer or another person acting on behalf of the seller or charitable organization, has maintained and recorded a list of telephone numbers the seller or charitable organization may not contact, in compliance with §310.4(b)(1)(iii)(A);

(iv) The seller or a telemarketer uses a process to prevent telemarketing to any telephone number on any list established pursuant to §310.4(b)(3)(iii) or 310.4(b)(1)(iii)(B), employing a version of the "do-not-call" registry obtained from the Commission no more than

thirty-one (31) days prior to the date any call is made, and maintains records documenting this process;

(v) The seller or a telemarketer or another person acting on behalf of the seller or charitable organization, monitors and enforces compliance with the procedures established pursuant to §310.4(b)(3)(i); and

(vi) Any subsequent call otherwise violating §310.4(b)(1)(ii) or (iii) is the result of error.

(4) A seller or telemarketer will not be liable for violating §310.4(b)(1)(iv) if:

(i) The seller or telemarketer employs technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured over the duration of a single calling campaign, if less than 30 days, or separately over each successive 30-day period or portion thereof that the campaign continues.

(ii) The seller or telemarketer, for each telemarketing call placed, allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call;

(iii) Whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the seller or telemarketer promptly plays a recorded message that states the name and telephone number of the seller on whose behalf the call was placed[666]; and

(iv) The seller or telemarketer, in accordance with §310.5(b)-(d), retains records establishing compliance with §310.4(b)(4)(i)-(iii).

(c) *Calling time restrictions.* Without the prior consent of a person, it is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in outbound telephone calls to a person's residence at any time other than between 8:00 a.m. and 9:00 p.m. local time at the called person's location.

(d) *Required oral disclosures in the sale of goods or services.* It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer in

---

[666] This provision does not affect any seller's or telemarketer's obligation to comply with relevant state and federal laws, including but not limited to the TCPA, 47 U.S.C. 227, and 47 CFR part 64.1200.

379

# Appendix B

an outbound telephone call or internal or external upsell to induce the purchase of goods or services to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, the following information:

(1) The identity of the seller;

(2) That the purpose of the call is to sell goods or services;

(3) The nature of the goods or services; and

(4) That no purchase or payment is necessary to be able to win a prize or participate in a prize promotion if a prize promotion is offered and that any purchase or payment will not increase the person's chances of winning. This disclosure must be made before or in conjunction with the description of the prize to the person called. If requested by that person, the telemarketer must disclose the no-purchase/no-payment entry method for the prize promotion; provided, however, that, in any internal upsell for the sale of goods or services, the seller or telemarketer must provide the disclosures listed in this section only to the extent that the information in the upsell differs from the disclosures provided in the initial telemarketing transaction.

(e) *Required oral disclosures in charitable solicitations.* It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer, in an outbound telephone call to induce a charitable contribution, to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, the following information:

(1) The identity of the charitable organization on behalf of which the request is being made; and

(2) That the purpose of the call is to solicit a charitable contribution.

[75 FR 48516, Aug. 10, 2010, as amended at 76 FR 58716, Sept. 22, 2011]

## § 310.5   Recordkeeping requirements.

(a) Any seller or telemarketer shall keep, for a period of 24 months from the date the record is produced, the following records relating to its telemarketing activities:

(1) All substantially different advertising, brochures, telemarketing scripts, and promotional materials;

(2) The name and last known address of each prize recipient and the prize awarded for prizes that are represented, directly or by implication, to have a value of $25.00 or more;

(3) The name and last known address of each customer, the goods or services purchased, the date such goods or services were shipped or provided, and the amount paid by the customer for the goods or services;[667]

(4) The name, any fictitious name used, the last known home address and telephone number, and the job title(s) for all current and former employees directly involved in telephone sales or solicitations; provided, however, that if the seller or telemarketer permits fictitious names to be used by employees, each fictitious name must be traceable to only one specific employee; and

(5) All verifiable authorizations or records of express informed consent or express agreement required to be provided or received under this Rule.

(b) A seller or telemarketer may keep the records required by § 310.5(a) in any form, and in the same manner, format, or place as they keep such records in the ordinary course of business. Failure to keep all records required by § 310.5(a) shall be a violation of this Rule.

(c) The seller and the telemarketer calling on behalf of the seller may, by written agreement, allocate responsibility between themselves for the recordkeeping required by this Section. When a seller and telemarketer have entered into such an agreement, the terms of that agreement shall govern, and the seller or telemarketer, as the case may be, need not keep records that duplicate those of the other. If the agreement is unclear as to who must maintain any required record(s), or if no such agreement exists, the seller shall be responsible for complying with §§ 310.5(a)(1)-(3) and (5); the telemarketer shall be responsible for complying with § 310.5(a)(4).

---

[667] For offers of consumer credit products subject to the Truth in Lending Act, 15 U.S.C. 1601 et seq., and Regulation Z, 12 CFR 226, compliance with the recordkeeping requirements under the Truth in Lending Act, and Regulation Z, shall constitute compliance with § 310.5(a)(3) of this Rule.

# Appendix B

(d) In the event of any dissolution or termination of the seller's or telemarketer's business, the principal of that seller or telemarketer shall maintain all records as required under this section. In the event of any sale, assignment, or other change in ownership of the seller's or telemarketer's business, the successor business shall maintain all records required under this section.

## §310.6  Exemptions.

(a) Solicitations to induce charitable contributions via outbound telephone calls are not covered by §310.4(b)(1)(iii)(B) of this Rule.

(b) The following acts or practices are exempt from this Rule:

(1) The sale of pay-per-call services subject to the Commission's Rule entitled "Trade Regulation Rule Pursuant to the Telephone Disclosure and Dispute Resolution Act of 1992," 16 CFR part 308, *provided,* however, that this exemption does not apply to the requirements of §§310.4(a)(1), (a)(7), (b), and (c);

(2) The sale of franchises subject to the Commission's Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising," ("Franchise Rule") 16 CFR part 436, and the sale of business opportunities subject to the Commission's Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities," ("Business Opportunity Rule") 16 CFR part 437, *provided,* however, that this exemption does not apply to the requirements of §§310.4(a)(1), (a)(7), (b), and (c);

(3) Telephone calls in which the sale of goods or services or charitable solicitation is not completed, and payment or authorization of payment is not required, until after a face-to-face sales or donation presentation by the seller or charitable organization, *provided,* however, that this exemption does not apply to the requirements of §§310.4(a)(1), (a)(7), (b), and (c);

(4) Telephone calls initiated by a customer or donor that are not the result of any solicitation by a seller, charitable organization, or telemarketer, *provided,* however, that this exemption does not apply to any instances of upselling included in such telephone calls;

(5) Telephone calls initiated by a customer or donor in response to an advertisement through any medium, other than direct mail solicitation, *provided,* however, that this exemption does not apply to calls initiated by a customer or donor in response to an advertisement relating to investment opportunities, debt relief services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or advertisements involving goods or services described in §§310.3(a)(1)(vi) or 310.4(a)(2)-(4); or to any instances of upselling included in such telephone calls;

(6) Telephone calls initiated by a customer or donor in response to a direct mail solicitation, including solicitations via the U.S. Postal Service, facsimile transmission, electronic mail, and other similar methods of delivery in which a solicitation is directed to specific address(es) or person(s), that clearly, conspicuously, and truthfully discloses all material information listed in §310.3(a)(1) of this Rule, for any goods or services offered in the direct mail solicitation, and that contains no material misrepresentation regarding any item contained in §310.3(d) of this Rule for any requested charitable contribution; *provided,* however, that this exemption does not apply to calls initiated by a customer in response to a direct mail solicitation relating to prize promotions, investment opportunities, debt relief services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or goods or services described in §§310.3(a)(1)(vi) or 310.4(a)(2)-(4); or to any instances of upselling included in such telephone calls; and

(7) Telephone calls between a telemarketer and any business, except calls to induce the retail sale of nondurable office or cleaning supplies; *provided,* however, that §310.4(b)(1)(iii)(B) and §310.5 of this Rule shall not apply to sellers or telemarketers of nondurable office or cleaning supplies.

# Appendix B

## § 310.7  Actions by states and private persons.

(a) Any attorney general or other officer of a state authorized by the state to bring an action under the Telemarketing and Consumer Fraud and Abuse Prevention Act, and any private person who brings an action under that Act, shall serve written notice of its action on the Commission, if feasible, prior to its initiating an action under this Rule. The notice shall be sent to the Office of the Director, Bureau of Consumer Protection, Federal Trade Commission, Washington, DC 20580, and shall include a copy of the state's or private person's complaint and any other pleadings to be filed with the court. If prior notice is not feasible, the state or private person shall serve the Commission with the required notice immediately upon instituting its action.

(b) Nothing contained in this Section shall prohibit any attorney general or other authorized state official from proceeding in state court on the basis of an alleged violation of any civil or criminal statute of such state.

## § 310.8  Fee for access to the National Do Not Call Registry.

(a) It is a violation of this Rule for any seller to initiate, or cause any telemarketer to initiate, an outbound telephone call to any person whose telephone number is within a given area code unless such seller, either directly or through another person, first has paid the annual fee, required by § 310.8(c), for access to telephone numbers within that area code that are included in the National Do Not Call Registry maintained by the Commission under § 310.4(b)(1)(iii)(B); provided, however, that such payment is not necessary if the seller initiates, or causes a telemarketer to initiate, calls solely to persons pursuant to §§ 310.4(b)(1)(iii)(B)(i) or (ii), and the seller does not access the National Do Not Call Registry for any other purpose.

(b) It is a violation of this Rule for any telemarketer, on behalf of any seller, to initiate an outbound telephone call to any person whose telephone number is within a given area code unless that seller, either directly or

through another person, first has paid the annual fee, required by § 310.8(c), for access to the telephone numbers within that area code that are included in the National Do Not Call Registry; provided, however, that such payment is not necessary if the seller initiates, or causes a telemarketer to initiate, calls solely to persons pursuant to §§ 310.4(b)(1)(iii)(B)(i) or (ii), and the seller does not access the National Do Not Call Registry for any other purpose.

(c) The annual fee, which must be paid by any person prior to obtaining access to the National Do Not Call Registry, is $58 for each area code of data accessed, up to a maximum of $15,962; provided, however, that there shall be no charge to any person for accessing the first five area codes of data, and provided further, that there shall be no charge to any person engaging in or causing others to engage in outbound telephone calls to consumers and who is accessing area codes of data in the National Do Not Call Registry if the person is permitted to access, but is not required to access, the National Do Not Call Registry under this Rule, 47 CFR 64.1200, or any other Federal regulation or law. Any person accessing the National Do Not Call Registry may not participate in any arrangement to share the cost of accessing the registry, including any arrangement with any telemarketer or service provider to divide the costs to access the registry among various clients of that telemarketer or service provider.

(d) Each person who pays, either directly or through another person, the annual fee set forth in § 310.8(c), each person excepted under § 310.8(c) from paying the annual fee, and each person excepted from paying an annual fee under § 310.4(b)(1)(iii)(B), will be provided a unique account number that will allow that person to access the registry data for the selected area codes at any time for the twelve month period beginning on the first day of the month in which the person paid the fee ("the annual period"). To obtain access to additional area codes of data during the first six months of the annual period, each person required to pay the fee under § 310.8(c) must first pay $58 for each additional area code of data

# Appendix B

not initially selected. To obtain access to additional area codes of data during the second six months of the annual period, each person required to pay the fee under §310.8(c) must first pay $29 for each additional area code of data not initially selected. The payment of the additional fee will permit the person to access the additional area codes of data for the remainder of the annual period.

(e) Access to the National Do Not Call Registry is limited to telemarketers, sellers, others engaged in or causing others to engage in telephone calls to consumers, service providers acting on behalf of such persons, and any government agency that has law enforcement authority. Prior to accessing the National Do Not Call Registry, a person must provide the identifying information required by the operator of the registry to collect the fee, and must certify, under penalty of law, that the person is accessing the registry solely to comply with the provisions of this Rule or to otherwise prevent telephone calls to telephone numbers on the registry. If the person is accessing the registry on behalf of sellers, that person also must identify each of the sellers on whose behalf it is accessing the registry, must provide each seller's unique account number for access to the national registry, and must certify, under penalty of law, that the sellers will be using the information gathered from the registry solely to comply with the provisions of this Rule or otherwise to prevent telephone calls to telephone numbers on the registry.

[75 FR 48516, Aug. 10, 2010; 75 FR 51934, Aug. 24, 2010, as amended at 77 FR 51697, Aug. 27, 2012]

## §310.9  Severability.

The provisions of this Rule are separate and severable from one another. If any provision is stayed or determined to be invalid, it is the Commission's intention that the remaining provisions shall continue in effect.

## PART 311—TEST PROCEDURES AND LABELING STANDARDS FOR RECYCLED OIL

Sec.
311.1  Definitions.
311.2  Stayed or invalid parts.
311.3  Preemption.
311.4  Testing.
311.5  Labeling.
311.6  Prohibited acts.

AUTHORITY: 42 U.S.C. 6363(d).

SOURCE: 60 FR 55421, Oct. 31, 1995, unless otherwise noted.

### §311.1  Definitions.

As used in this part:

(a) *Manufacturer* means any person who re-refines or otherwise processes used oil to remove physical or chemical impurities acquired through use or who blends such re-refined or otherwise processed used oil with new oil or additives.

(b) *New oil* means any synthetic oil or oil that has been refined from crude oil and which has not been used and may or may not contain additives. Such term does not include used oil or recycled oil.

(c) *Processed used* oil means re-refined or otherwise processed used oil or blend of oil, consisting of such re-refined or otherwise processed used oil and new oil or additives.

(d) *Recycled oil* means processed used oil that the manufacturer has determined, pursuant to section 311.4 of this part, is substantially equivalent to new oil for use as engine oil.

(e) *Used oil* means any synthetic oil or oil that has been refined from crude oil, which has been used and, as a result of such use, has been contaminated by physical or chemical impurities.

(f) *Re-refined oil* means used oil from which physical and chemical contaminants acquired through use have been removed.

### §311.2  Stayed or invalid parts.

If any part of this rule is stayed or held invalid, the rest of it will remain in force.

### §311.3  Preemption.

No law, regulation, or order of any State or political subdivision thereof